IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | |
|---|---|
| James P. Madura, | ) |
| | ) C/A No. 1:08-3443-MBS |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| Westinghouse Savannah River Company | ) |
| and Westinghouse Savannah River Site | ) |
| Benefits Plan/Administrator, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**

This is an action seeking review of a claim for long-term disability ("LTD") benefits under an employee benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq*. Plaintiff James P. Madura alleges that he was denied long term disability (LTD) benefits to which he was entitled under a Disability Income Plan (the "LTD Plan") provided by Defendant Westinghouse Savannah River Company ("WSRC") to its employees. Plaintiff brings this action challenging the denial of benefits under 29 U.S.C. § 1132(a)(1)(B), which provides:

> A civil action may be brought--(1) by a participant or beneficiary . . . (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]

The parties filed a joint stipulation and the administrative record on May 23, 2009 (Entries 22, 23). This matter is before the court on cross-memoranda for judgment. Defendants filed their memorandum on June 12, 2009 (Entry 25). Plaintiff filed his memorandum on July 6, 2009 (Entry 30), to which Defendants filed a reply on July 13, 2009. The court heard argument on November 30, 2009. The court has considered the submissions by the parties, the administrative record, the

Plan, and the arguments of counsel. The court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Plaintiff was employed by WSRC as a Senior Asbestos Abatement/Decontamination and Decommissioning ("D&D") Technician. (Entry 23-1, 94.) D&D Technicians remove building components to assist with demolition. In his position, Plaintiff frequently was required to lift up to 25 pounds, including lifting from the ground to his waist and shoulders, and from his waist to his shoulders. He spent at least four hours a day standing and three climbing ladders. He performed repetitive hand use (grasping and twisting), and worked in extreme heat and cold, with exposure to noise, poor lighting, and asbestos. (Entry 23-1, 94.) Plaintiff has a history of coronary artery disease, hyperlipidemia, obesity, hypertension, Wolfe-Parkinson-White Syndrome, bradycardia, and dyspnea on exertion. (Entry 23-1, 1.)

2. As long as Plaintiff was actively employed, he was entitled to receive LTD benefits under the LTD Plan. Among other things, the LTD Plan provides:

    > You qualify for Long-Term Disability benefits if you are unable to work at any reasonable occupation due to an illness or injury.

    (Entry 23, 9.) The LTD Plan further provides:

    > The information required to qualify for Long-Term Disability includes medical evidence that supports your Long-Term Disability and an authorization to release medical records and reports to the SRS Medical Department and any outside disability review group. The medical evidence should include a statement from your attending physician as to the reason why you are disabled and the length of time your disability is expected to last.

    (Entry 23, 11.) The LTD Plan excludes an illness or injury occurring after employment ends for any reason. (Entry 23, 12.)

3. The LTD Plan further provides that:

> The Plan Administrator and those persons acting on the Plan Administrator's behalf are vested with full power and sole discretion to interpret all the terms of the Plan and will make the final determination based solely on the applicable facts and evidence. All decisions of the Plan Administrator are final and binding.

(Entry 23, 19.)

4. Plaintiff suffered a heart attack in September 2004, when he was 56 years old. Plaintiff subsequently underwent a cardiac catheterization with Coronary Artery Bypass Graft ("CABG") on September 23, 2004. (Id.; Entry 23-1, 80.) Plaintiff responded well to the procedure and was discharged on September 30, 2004. (Entry 23-1, 1.)

5. Plaintiff returned to work on limited duty but continued to suffer discomfort. On January 13, 2005, Plaintiff underwent a Percutaneous Transluminal Coronary Angioplasty ("PTCA") with stent placement. (Entry 23-1, 80.)

6. On February 8, 2005, Sam Rahman, M.D. of the South Carolina Heart Center examined Plaintiff. He stated that Plaintiff was doing fine since his discharge but he continued to experience occasional chest pain. Plaintiff denied any shortness of breath. He was enrolled in USC Aiken Rehab Program and was doing fine with that. (Entry 23-1, 80.) Dr. Rahman reported that Plaintiff appeared to be stable from a clinical standpoint with no complications at the arterial puncture site. Dr. Rahman stated that Plaintiff's chest pain was "atypical and I encouraged him to use nitroglycerin p.r.n. for that. [I] encouraged him to lose weight and to discuss dietary methods to achieve that with the dietitian at USC Aiken Rehab Program." (Entry 23-1, 80-81.)

7. Plaintiff was examined by Paul M. Kirschenfeld, M.D. of Carolina Pulmonary and Critical Care on or about March 18, 2005. Dr. Kirschenfeld noted that on examination, Plaintiff

appeared to be well and in no respiratory distress at rest. Dr. Kirschenfeld stated that Plaintiff had asbestos pleural disease with no evidence of asbestosis. He advised Plaintiff that his shortness of breath was probably not due to any type of lung disease, but that he was at risk for other diseases and should have at least an annual chest x-ray and PFT [pulmonary function testing]. (Entry 23-1, 96-97.)

8. On March 23, 2005, Plaintiff again was examined by Sam Rahman, M.D. Dr. Rahman reported that Plaintiff had been doing fine until February 25, 2005 when Plaintiff had an episode of extreme fatigue and almost passed out. Plaintiff denied any chest pain but complained of shortness of breath with minimal exertion. Dr. Rahman reported that Plaintiff had an exercise stress test with myocardial perfusion study on March 17, 2005 which demonstrated "a very small area in the antercapical segment with some mild reversible defect suggesting ischemia in that distribution." (Entry 23-1, 101.) Dr. Rahman opined that the ischemia was due to incomplete revascularization following bypass surgery "and it does not appear to be a clinically significant defect." (Entry 23-1, 105.)

9. Plaintiff applied for LTD benefits on March 28, 2005.[1] (Entry 23-1, 92.) His claim was reviewed by Colette Reinhardt, RN, of Broadspire Services, who determined that the "[m]edical documentation review of current medical records and analysis based on medical literature does not appear to support total disability at this time." (Entry 23-1, 2.)

10. On April 4, 2005, Stephen C. Youmans, M.D. of Tri-County Family Medicine reported to Defendants' disability case manager that Plaintiff could not return to limited or part-time duty for six months at the earliest. (Entry 23-1, 99.)

---

[1] Plaintiff also applied under the WSRC Pension Plan for incapability retirement (IR) benefits, which he was granted.

11. On April 13, 2005, Plaintiff's medical records were examined by D.C. Pratt, M.D. He noted that Plaintiff complained of shortness of breath from exertion. Dr. Pratt noted that Plaintiff had coronary artery disease and some pulmonary disease. Dr. Pratt stated that Plaintiff could not do his present occupation, but "he should be able to do a sedentary type job." (Entry 23-1, 90.)

12. On April 28, 2005, Plaintiff was examined by Bashire Lone, M.D of South Carolina Heart Center. Plaintiff reported upper abdominal discomfort usually related to food intake. (Entry 23-1, 87.) Dr. Lone determined that Plaintiff was "stable from cardiovascular standpoint. His upper left abdominal discomfort is related to food intake usually and may benefit from GI evaluation if not relieved with symptomatic therapy. . . . He was advised to do daily exercise to get his HDL up. We will see him in six months. He is advised to report to ER in case of severe chest pain or SOB [shortness of breath]." (Entry 23-1, 89.)

13. Plaintiff was terminated on April 30, 2005.

14. On May 11, 2005, the Site Medical Director, W. Gaines Entrekin, M.D., reviewed Plaintiff's records and determined that he could not perform hard physical labor, but should be capable of sedentary work. Dr. Entrekin noted that Plaintiff had coronary artery disease and pleural plaques, possibly from asbestos exposure, and that he was "Not sure!" of Plaintiff's prognosis. Dr. Entrekin determined that the "medical documentation review of the current medical records and analysis of job requirements and the chronic nature of [Plaintiff's] condition, appears to support that he is unable to perform duties of his regular job and would therefore qualify for the [IR benefits]." (Entry 23-1, 82.) The SRS Medical Review Committee also reviewed Plaintiff's claim and determined that the "medical documentation does not support request for long-term disability benefits." (Id.).

15. On May 17, 2005, the Disability Case Administrator notified Plaintiff that his claim for LTD benefits had been denied "as your medical condition does not exclude you from being gainfully employable in sedentary occupations." (Entry 23-1, 67-68).

16. On May 27, 2005, Plaintiff was seen by Dr. Rahman. Dr. Rahman reported that Plaintiff requested a letter indicating that he is disabled. According to Dr. Rahman, Plaintiff continued to complain of shortness of breath and chest pain with minimal exertion. Dr. Rahman noted that he would like to repeat a cardiac cathertization to rule out the progression of coronary artery disease and to document that Plaintiff's symptoms are not related to potentially revascularizable lesions. Dr. Rahman informed Plaintiff that he was not in a position to determine whether he is disabled, but could only report the symptoms reported by Plaintiff and the results of any tests. (Entry 23-1, 58-59.)

17. Plaintiff underwent a cardiac catherterization on June 10, 2005. Patrick A.X. Hall, M.D. reviewed the catherterization film and stated that Plaintiff's left ventricular function was well preserved, but there appeared to be a stenosis in the mid-circumflex coronary artery between two previously-placed Taxus stents. Dr. Hall stated that the right coronary artery had a borderline stenosis and he recommended evaluation and possible intervention. (Entry 23-1, 56-57.)

18. On July 12, 2005, Plaintiff sought a second opinion from Don L. Pennington, M.D. of Carolina Heart and Vascular Center. Dr. Pennington reviewed Plaintiff's medical records and opined that "it appears that [Plaintiff] is unable to continue with regular employment at the Savannah River Site and that he has difficulty due to shortness of breath and chest pain with minimal exertion. Perhaps if he undergoes additional angioplasty and/or additions to his current medications, he may be able to increase his activity." (Entry 23-1, 51.)

19. Dr. Pennington examined Plaintiff on July 25, 2005. Dr. Pennington noted coronary artery disease with previous coronary artery bypass and stenting; anginal syndrome; history of hypertension; hyperlipidemia; history of possible sleep apnea; obesity; and Wolf-Parkinson-White. (Entry 23-1, 52.)

20. Plaintiff appealed the denial of LTD benefits on August 7, 2005. Plaintiff supplied the Plan Administrator with additional medical records from Drs. Rahman, Hall, and Pennington. The new medical documentation was reviewed by a WSRC site physician who opined that the records were "inconclusive as to [Plaintiff's] condition" and that there was "nothing in the documents that substantiate[s Plaintiff] as unable to perform any reasonable occupation." (Entry 23-1, 48.)

21. The Plan Administrator conducted a de novo review and determined there was no objective medical information in the record to support a finding that Plaintiff was not capable of sedentary work. The Plan Administrator denied Plaintiff's claim for LTD benefits by letter dated September 23, 2005. Among other things, the Plan Administrator noted that the new medical records were all dated beyond Plaintiff's termination date of April 30, 2005. (Entry 23-1, 47.) Plaintiff filed the instant action on September 10, 2008.

## CONCLUSIONS OF LAW

1. Where, as in this case, an ERISA plan confers upon its administrator discretionary authority in the exercise of its power, the administrator's denial of benefits is reviewed under an abuse of discretion standard. Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan, 201 F.3d 335, 341 (4th Cir.2000). Such a discretionary decision "will not be disturbed if reasonable, even if the court itself would have reached a different conclusion." Id. (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111 (1989)). In weighing the

reasonableness of the plan administrator's determination, the court considers the following factors, among others:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

Booth, 201 F.3d at 342-43.

2. When "an ERISA administrator rejects a claim to benefits on the strength of substantial evidence, careful and coherent reasoning, faithful adherence to the letter of ERISA and the language in the plan, and a fair and searching process, there can be no abuse of discretion." Evans v. Eaton Corp., 514 F.3d 315, 325-26 (4th Cir. 2008). Moreover, the quantum of evidence necessary to qualify as "substantial" is not great; it must be more than a scintilla, but can be less than a preponderance. Ellis v. Metro Life Ins. Co., 126 F.3d 228, 235 (4th Cir. 1997).

3. The court concludes that Plaintiff's claim was evaluated by a thorough and reasoned administrative review process. The decision of the Plan Administrator was the product of a deliberate, principled process and was supported by substantial evidence. As such, the Plan Administrator did not abuse her discretion. The court concludes that Defendants are entitled to judgment as a matter of law.

Accordingly, it is **ORDERED** that judgment be entered in favor of Defendants.

**IT IS SO ORDERED.**

/s/ Margaret B. Seymour<br>United States District Judge

Columbia, South Carolina

December 11, 2009